**In re Jack J. GRYNBERG, Debtor.**

**In re Celeste C. GRYNBERG, Debtor.**

**DANZIG CLAIMANTS, Applicants,**

v.

**Jack J. GRYNBERG and Celeste C. Grynberg, Respondents.**

**Bankruptcy Nos. 81 B 00821 C, 81 B 00825 C.**

United States Bankruptcy Court, D. Colorado.

April 16, 1990.

See also, Bkrtcy., 82 B.R. 568.

James C. Ruh, Denver, Colo., for applicants.

Neil E. Ayervais, Denver, Colo., for debtor-respondent Jack J. Grynberg.

William D. Scheid, Denver, Colo., for debtor-respondent Celeste C. Grynberg.

### ORDER ON MOTION FOR PAYMENT OF COSTS

PATRICIA A. CLARK, Bankruptcy Judge.

This matter is before the Court on applicants' motion for payment of costs from the deposit established by this Court's Order and an objection thereto filed by the debtors.

A judgment was entered against the Grynbergs and in favor of a class which included the applicants by the Superior Court in and for the County of Alameda and State of California on or about February 4, 1981 (the judgment).

The debtors filed individual bankruptcy petitions under Chapter 11 of the Bankruptcy Code on February 21, 1981.

A cost memorandum claiming $2,039.80 was filed in the California trial court on March 18, 1981 by counsel for the applicants (first cost memorandum). All costs claimed therein related to costs expended pre-petition to execute upon the judgment.

On May 11, 1981, the debtors were given authority to employ California counsel and to prosecute an appeal from the judgment.[1] While such appeal was pending, the debtors requested and received permission to substitute collateral held by the applicants. The Court approved the release of liens previously asserted by the applicants upon properties of the debtors located in the states of California, Colorado, Montana, Utah and Wyoming in exchange for the establishment of a deposit in the initial amount of $7,150,000 (the deposit).

A cost memorandum claiming $10,244.58 was filed in the California trial court on March 11, 1985 (second cost memorandum). These costs related to the debtors' unsuccessful appeal to the California Court of Appeals and petition to the California Supreme Court.

The claims held by the applicants were scheduled by the debtors as disputed claims. The court ordered all holders of disputed claims to file claims on or before July 31, 1981. Each applicant filed a claim prior to that deadline. None of these claims sought postpetition costs of preserving and defending the California judgment.

---

**1.** Arguments that the requested relief should be denied because the Danzig Claimants neither sought nor received relief from the automatic stay are unpersuasive. 11 U.S.C. §§ 362(d). The stay was modified at the request of the debtors to allow the pursuit of the appeal. By the Court's action, all further judicial proceedings were validated. *See generally, Ellis v. Consolidated Diesel Electric Corp.,* 894 F.2d 371, 373 (10th Cir.1990).

The debtors' joint plan of reorganization was confirmed on April 21, 1982. The confirmed plan provides for the payment of timely filed allowed claims.

The applicants by their motion request the payment of costs from the deposit established as substitute collateral for the applicants' claims. The debtors object to the payment of all such costs which were entered in the margin of the California judgment postpetition primarily because the applicants did not obtain a relief from stay from the bankruptcy court before they submitted the cost memoranda to the California trial court. The applicants respond that the lifting of the automatic stay by the bankruptcy court at the request of the debtors on May 11, 1981 was sufficient court action for them to recover the execution costs represented by the first cost memorandum. Further, the applicants argue that the costs of the appeal were solely postpetition claims not subject to the automatic stay.

The Court is asked to deal with two distinct types of costs by the present motion. The Court must first decide whether or not the execution costs represented by the first cost memorandum constituted a "claim" within the meaning of the Bankruptcy Code on the date the petition was filed. Secondly, the Court must determine whether or not the costs associated with defending the judgment through the ultimately unsuccessful appellate process constitute the same type of "claim."

■ Under the Bankruptcy Act, the claims presently before the Court would not likely have been allowed. For an unliquidated or contingent claim to be allowed, Section 57(d) of the Act required that it be liquidated or capable of estimation without undue delay to estate administration. Debts not capable of such proof were excluded from discharge and the claimant was allowed to pursue his claim after discharge. *See* 11 U.S.C. § 35(a) (1976) (Act Section 17). These provisions frequently resulted in unequal distribution among similarly situated claimants. Reorganized debtors were often saddled with nondischargeable debts and the sheer volume of litigation of such nondischarged claims could seriously threaten a debtor's ability to reorganize. *See, In re Pettibone Corp.,* 90 B.R. 918, 923–24 (Bankr.N.D.Ill.1988).

In an effort to broaden the scope of discharge, the drafters of the Bankruptcy Code eliminated the provability requirement. H.R. 8200, 95th Cong., 1st Sess. § 101(4)(A)(1977), *reprinted in* 1978 U.S. Code Cong. and Admin.News 5787, 5963, 6141 ("H.R. 8200 abolishes the concept of provability in bankruptcy cases. All claims against the debtor, whether or not contingent or unliquidated, will be dealt with in the bankruptcy case.... The proposed law will permit a complete settlement of the affairs of a bankrupt debtor, and a complete discharge and fresh start.")

An essential element of the Bankruptcy Code's scheme for a broader discharge is an expanded definition of "claim." A "claim" is now defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(4)(A). The legislative history supporting the definition of "claim" indicates that the "broadest possible definition" was intended by Congress so that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case" and "the broadest possible relief" will be afforded a debtor. H.R. 595, 95th Cong., 1st Sess., 309 (1977), *reprinted in* 1978 U.S.Code Cong. and Admin.News 5963, 6266; S.Rep. No. 989, 95th Cong., 2d Sess., 21–22 (1978), *reprinted in* 1978 U.S. Code Cong. and Admin.News 5787, 5807–08. This broad definition of "claim" is intertwined with the claims allowance provision in Section 502 which now provides an estimation process for contingent or unliquidated claims. 11 U.S.C. § 502(c).

■ The Bankruptcy Code stays only those proceedings which were commenced or could have been commenced prepetition and proceedings on claims which *arose* prepetition. *See* 11 U.S.C. § 362(a)(1). The automatic stay has no effect whatsoever upon claims which arose after the petition

was filed. *See, e.g., Turner Broadcasting System, Inc. v. Sanyo Electric, Inc.,* 33 B.R. 996, 999 (N.D.Ga.1983), *aff'd,* 742 F.2d 1465 (11th Cir.1984). The interaction of Sections 101(4) and 502(c), along with the operation of the automatic stay under Section 362(a), "give authority for bankruptcy courts to deal comprehensively with all facets of reorganization." *In re Pettibone Corp., supra* at 925.

The parties point out a split of authority between the circuits regarding the interpretation under Section 362(a)(1) of when a right to payment of an unmatured claim arises.

The applicants support adoption of the view held by the Third Circuit. In *Matter of M. Frenville Co.,* 744 F.2d 332 (3rd Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985) the Circuit Court held that the automatic stay was inapplicable to a situation in which the acts of the debtor which gave rise to the cause of action *occurred* prepetition but a state cause of action based on those acts did not *arise* until postpetition.[2] The Third Circuit distinguished the result in *Frenville* from situations involving indemnity or security contracts where the parties agree in advance that one will indemnify the other in the event a specified event occurs. In the case of such a contract, the Third Circuit acknowledges that a right to payment, albeit contingent, exists upon the signing of the agreement. *Id.* at 336.

The debtors respond by citing several cases which expressly and openly criticize the result reached in *Frenville.* In *In re Black,* 70 B.R. 645 (Bankr.D.Utah 1986) the court held that "[t]o read § 101(4) as the movants suggest [and as *Frenville* does] would have the effect of judicially writing

the terms 'contingent' and 'unmatured' out of the definition, and redrafted [sic] the clear legislative intent to expand the 'claim' concept." *Id.* at 650. *See also Matter of Johns–Manville Corp.,* 68 B.R. 618, 628–29 (Bankr.S.D.N.Y.1986) (implying that the Court would reject the *Frenville* line of cases but "there is no need to reach this issue."); *In re Johns–Manville Corp.,* 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986) ("The analysis propounded by *Frenville* ... permits parties to artificially juggle their existing substantive rights by deciding for themselves the best time to serve process."); *In re Edge,* 60 B.R. 690, 704 (Bankr.M.D.Tenn.1986) (*Frenville* confuses "the existence of a present right of action or access to the courts with the existence of a 'claim' for bankruptcy purposes ... [and] has been criticized for failing to differentiate access to the courts and 'claim' in bankruptcy.")

This Court is persuaded by the reasoning of the cases from outside of the Third Circuit. Those cases appear to be more faithful to the clear legislative intent of eliminating the element of "provability" as existed under the Bankruptcy Act. Further, the interpretations made by such courts more effectively give full meaning to each and every word of Section 101(4), particularly the words "contingent" and "unmatured." 11 U.S.C. § 101(4)(A). It must follow that the costs represented by the first cost memorandum fit the definition of claim, arose prepetition and are, therefore, discharged because of the applicants' failure to file a timely proof of claim covering these items.[3]

■ The matter of the second cost memorandum which deals exclusively with costs incurred postpetition in connection with the

---

2. *Frenville* dealt with the effect of Section 362(a)(1) upon a third-party complaint for contribution or indemnity. In New York, such a cause of action arises when another party pays the resulting judgment and not at the time that the underlying tortious act was committed.

3. The applicants argue that they were personally relieved from seeking relief from the automatic stay provisions of Section 362 to file both of their cost memoranda in the California trial court. They cite *In re Frank,* 80 B.R. 19 (Bankr.

E.D.N.Y.1987) for their proposition. The *Frank* case is inapposite to the issue before this Court as it deals only with the narrow issue of the effect of a relief from stay upon the trustee's power to avoid a postpetition transfer of property of the estate. 11 U.S.C. § 549(a). The *Frank* court found that lifting the stay fulfills the statute's requirement of court authorization. *Id.* at 20. The applicants neither sought nor were given relief from the automatic stay in their own right at any time during these cases.

debtors' appeal of the prepetition judgment presents a more unusual and troublesome issue.

Even the cases from outside the Third Circuit which have held that a "claim" may exist without a right to an immediate payment of money seem to place at least one restriction upon their expansive definition of "claim." The triggering act which constitutes the *basis* for the cause of action must have occurred *prior* to filing the petition in bankruptcy. *See, e.g., Grady v. A.H. Robins,* 839 F.2d 198, 202–03 (4th Cir.1988); *Edge, supra; Black, supra; Matter of Thomas,* 12 B.R. 432, 434 (Bankr.S.D.Iowa 1981). In all of these cases, there was some direct prepetition privity, contact, impact, or hidden harm to the ultimately injured plaintiff or indemnity claimant. In cases of prepetition exposure to harmful chemicals, drugs, materials, or interuterine devices, the courts presume that a bodily injury was sustained at the time of the exposure to the defective product. *Accord In re Pettibone Corp., supra* at 932. The result which manifested itself postpetition *in no way* depended on further acts of the defendant. *Id.* at 931.

In the present situation, however, the applicants argue that the claim for costs in the second cost memorandum arose only out of the fact of the *appeal.* They argue that the triggering act was the postpetition initiation of the appeal and *not* the original fraudulent acts committed by the Grynbergs upon which the prepetition judgment was based.

An analogous situation was presented to the court in *Matter of Hadden,* 57 B.R. 187 (Bankr.W.D.Wis.1986). The debtor in *Hadden* commenced a civil action in state court alleging a breach of contract. Subsequent to filing the civil action but prior to trial on the matter, the debtor filed for relief under Chapter 7 of the Bankruptcy Code. The debtor was granted a discharge. After the state court trial, the debtor's cause of action was dismissed and the defendant was granted a judgment on his counterclaim for attorney's fees. In the words of the Court,

"[t]he sole issue to be determined is whether the debtor's voluntary continuation of pending litigation after his filing for bankruptcy created a nondischargeable post-petition debt" for a portion of the defendant's attorney's fees. *Id.* at 188. The court distinguished between pre-bankruptcy acts the costs of which continue to accrue after filing, as in the personal injury and indemnity cases discussed *supra,* and costs which the debtor voluntarily incurs postbankruptcy through independent postbankruptcy acts. In the eyes of the *Hadden* court, dischargeability depends upon the "operative facts giving rise to the obligation." *Id.* at 190. The *Hadden* court concluded as follows:

A principal goal of bankruptcy is to provide the debtor with reasonable exemptions and a fresh start. Allowing the debtor to discharge attorney's fees incurred in the post-petition pursuit of dubious claims might invite egregious abuses, while not allowing discharge of attorney's fees might prevent debtors from pursuing "reasonable exemptions" which are in the form of lawsuits. *The balance must be struck so that post-bankruptcy acts on the part of the debtor cannot be undertaken with impunity.* This follows from the general principle that only liabilities arising from pre-petition acts are discharged in bankruptcy. If the debtor chooses to enjoy his fresh start by pursuing pre-petition claims which have been exempted, he must do so at the risk of incurring the post-petition costs involved in his acts.

*Id.* at 190 (emphasis added).

So it should be in the case at bar. The underlying judgment was a claim which was undeniably discharged under the debtors' confirmed joint plan of reorganization. Instead of treating it as such, the debtors chose to pursue appeals on the judgment "through the entire state and federal appellate systems twice over a period of almost nine years." Reply Brief in Support of Motion of Danzig Claimants for Payment of Costs at p. 4.[4]

---

**4.** The debtors maintain the postpetition costs expended in defending the appellate attacks were merely ancillary to a dischargeable claim. The cases most frequently cited for this proposi-

■ This Court has considered the nature of the costs represented by both cost memoranda and the proper bankruptcy treatment thereof. This Court agrees with the reasoning expressed by those cases outside of the Third Circuit that the bankruptcy definition of claim is not inextricably linked to the accrual of a cause of action under state law. The costs incurred prepetition relative to execution on the California judgment, represented by the first cost memorandum, are prepetition claims which were discharged for lack of a timely filed proof of claim. The appellate costs represented by the second cost memorandum were not costs which necessarily accrued due to the prepetition actions of the debtors which led to the California judgment. Rather, these costs resulted solely from the voluntary postpetition acts of the debtors in pursuing a lengthy, delaying, and ultimately twice unsuccessful appeal process. These latter costs were not predestined because of the fraud that occurred prepetition. Therefore, the costs represented by the second cost memorandum are postpetition claims and are not discharged by the debtors' confirmed joint plan of reorganization.

Accordingly, it is ORDERED, ADJUDGED and DECREED that the motion for payment of costs from the deposit is denied as to the principal sum of $2,039.80 in taxable costs and interest thereon, which sum represents the amount claimed pursuant to the first cost memorandum, and granted as to the remainder of the costs requested.

---

tion involve the converse situation, costs associated with enforcement of *nondischargeable* debts. *See, e.g., In re Chambers,* 36 B.R. 42 (Bankr.W.D.Wis.1984) (concerning the Section 523(a)(5) exception from discharge for support obligations); *Matter of Thomas,* 12 B.R. 432 (Bankr.S.D.Iowa 1981) (same). *See, Matter of Hadden,* 57 B.R. 187, 190 (Bankr.W.D.Wis.1986) (Debtors "resurrected" the judgment after its discharge and reaffirmed their obligation to pay costs if they lost.).