Counsel for Collins is directed to submit an appropriate Order for entry, on notice, within 15 days.

In re STORAGE TECHNOLOGY CORPORATION, and affiliated companies, Debtors.

In re STORAGE TECHNOLOGY LEASING CORPORATION, et al., Debtors.

STORAGE TECHNOLOGY CORPORATION and Storage Technology De Puerto Rico, Inc., Plaintiffs,

v.

COMITE PRO RESCATE DE LA SALUD, et al., Defendants.

Bankruptcy Nos. 84 B 5377 J through 84 B 5380 J and 84 B 5512 J, 86 B 4222 J through 86 B 4234 J. Adv. No. 87 J 1032.

United States Bankruptcy Court, D. Colorado.

July 18, 1990.

Nancy J. Gegenheimer, Holme Roberts & Owen, Denver, Colo., for plaintiffs.

Michael E. Withey, Schroeter, Goldmark & Bender, Seattle, Wash., Anthony Z. Roisman, Cohen, Milstein & Hausfeld, Washington, D.C., Pedro J. Varela, Abogado, Hato Rey, P.R., and John R. Holland, Law Offices of John R. Holland, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

ROLAND J. BRUMBAUGH,
Bankruptcy Judge.

### HISTORY OF THE CASE

The Complaint herein was filed December 21, 1987, seeking declaratory and injunctive relief against approximately 68 individuals and organizations. The Complaint. alleges, basically, that the Defendants (hereinafter referred to as "CPR") filed a civil action in the U.S. District Court for the District of Puerto Rico against the Plaintiffs (hereinafter referred to as "STC"), and others, seeking injunctive relief and monetary damages for what STC asserts were pre-petition claims which were discharged in this bankruptcy proceeding.

On January 7, 1988, an Amended Complaint was filed adding 16 new companies or organizations as Co–Defendants because of the fear that these Co–Defendants may file cross-claims for contribution against STC in the Puerto Rico action. CPR filed an Answer and Counterclaims on April 19, 1988, seeking declaratory relief and "allowance of their claims" in this bankruptcy proceeding. STC filed an Answer to the Counterclaims on May 9, 1988.

On June 7, 1988, STC filed a Motion for Summary Judgment and a brief in support of the Motion. On June 16, 1988, the Motion was set for hearing for August 4, 1988. On June 28, 1988, CPR's counsel filed a "Statement Pursuant to Rule 56(f), F.R.Civ.P. in Opposition to Motion for Summary Judgment" wherein they alleged that CPR could not submit affidavits in opposition because they had not undertaken any discovery. CPR also filed on that date a memorandum brief and a "Statement of Facts in Opposition to Motion for Summary Judgment" which was signed only by counsel for CPR and was unverified. On August 1, 1988, STC filed its reply brief, which included an affidavit that indicated that CPR had, indeed, engaged in extensive discovery in the Puerto Rico action. The hearing on the Motion was held August 4, 1988. On August 11, 1988, this Court issued its Memorandum Opinion and Order finding that CPR was afforded ample opportunity for discovery in the Puerto Rico action and had over seven months in this case to obtain discovery, and yet failed to submit any opposition affidavits. The Court went on to grant STC's Motion for Summary Judgment and Judgment thereon entered August 15, 1988. CPR filed a Motion to Alter or Amend Judgment on August 25, 1988, and after receiving briefs from the parties, the Court denied that Motion on September 27, 1988.

CPR appealed on October 6, 1988, to the U.S. District Court. On March 13, 1989, the U.S. District Court, in Civil Action No. 88 Z 1647, reversed this Court and remanded the case.

On May 26, 1989, STC filed a Motion for Summary Judgment on the Counterclaims.

CPR responded to this Motion on June 15, 1989, and the matter was set for hearing on July 14, 1989. On July 10, 1989, the parties filed a Stipulation resolving this Motion for Summary Judgment and the Court approved that Stipulation on July 21, 1989. That Stipulation provided (1) that the Clean Air Act claims of CPR against STC had been settled and, therefore, summary judgment as to these claims should be granted in this Adversary Action; (2) that the adjudication of STC's Motion for Summary Judgment as to the claims of CPR under the Resource Conservation and Recovery Act should await disposition of the Puerto Rico Action in U.S. District Court on appeal. If said claims are dismissed by a final nonappealable order, summary judgment of dismissal will be appropriate in this Adversary Proceeding. If such claims are remanded for trial on the merits the parties did not, by the Stipulation, agree as to the forum where those claims should be tried, but they did agree that, in such event, that CPR be given a, trial on the merits of those claims.

On July 13, 1989, STC requested a trial setting, apparently abandoning its first Motion for Summary Judgment which had been remanded to this Court by the U.S. District Court. On June 21, 1989, this Court issued its scheduling order under Bankruptcy Rule 7016 and set a trial date of January 9, 1990.

On September 18, 1989, STC filed another Motion to Amend Complaint because these same Defendants (except one person) had filed another civil action against STC in the Superior Court of Mayaguez, Puerto Rico ("State Court Action") in August, 1989. This Court granted STC's Motion on September 20, 1989, and the Amended Complaint was filed on September 29, 1989. CPR has *never* filed an Answer to this Amended Complaint nor had it *ever* amended its original Answer and Counterclaims which it filed April 19, 1988.

Also on September 18, 1989, STC moved to compel responses to discovery from CPR. On September 20, 1989, this Court ordered CPR "to provide to plaintiffs responses from each individual defendant to

plaintiffs' first set of interrogatories within 20 days of the date of this order, failing which sanctions, including judgment for Plaintiffs may be imposed." On September 28, 1989, CPR moved for reconsideration of the September 20, 1989 Order and requested an additional 20 days to comply because of the effects of Hurricane Hugo in Puerto Rico. On September 27, 1989, the parties had already filed a stipulation extending the response time to October 30, 1989, and the Court granted that request on October 3, 1989.

On October 18, 1989, the parties filed a joint motion to continue the trial date. This Court acceded to their request and issued an amended Rule 16 Order on October 20, 1989, setting trial for January 30, 1990.

On January 17, 1990, STC filed a Motion to Limit Evidence under Rule 37(d), F.R. Civ.P., because of CPR's failure and refusal to answer discovery propounded on December 1, 1989, which was designed to determine when each of the "claims" of the Defendants arose. CPR filed a statement of opposition on January 25, 1990. On January 23, 1990, STC filed a Proposed Pretrial Order in accordance with the previous Rule 16 Order. CPR did not sign that Proposed Pretrial Order. On January 24, 1990, STC filed an objection to several of CPR's proposed exhibits based on authenticity and hearsay objections. None of these matters could be resolved because trial commenced on January 30, 1990.

At the commencement of trial on January 30, 1990, STC filed a Motion to Dismiss certain Defendants' Counterclaims and disallowing all claims by such Defendants because they failed to abide by this Court's Order of September 20, 1989, as amended by the Order of October 3, 1989, concerning discovery. CPR objected and asserted that they had not previously been furnished a copy of the Motion and wished to compare the names on the Motion with their records. The Court allowed CPR time to make such a comparison, and on January 31, 1990, STC filed a new Motion with a corrected list of the Defendants affected. On February 1, 1990, the Court granted STC's second Motion to Dismiss those certain Defendants listed in that Motion. Judgment on that Order also entered February 1, 1990. On February 9, 1990, CPR filed a Motion to Reconsider that Order and Judgment. STC responded on February 15, 1990. After hearing on notice, the Court denied the Motion to Reconsider on April 30, 1990.

The trial was held on January 30, 31, February 1, 2 and 9, 1990. During the trial, counsel for parties each proffered deposition testimony of various witnesses. Counsel were instructed to submit a written designation of the deposition testimony they wish to introduce, and each side would be allowed to object to such designations. Those designations and objections have now been filed. During the trial, CPR moved to strike the live testimony of Dr. Raymond Holmes and the Court took the matter under advisement and directed the parties to file briefs on the issue. Those briefs have now been filed. At the conclusion of the evidence, counsel were instructed to file post-trial briefs generally, and also to file separate briefs on the issue of whether the case of *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) was applicable to the citizens of Puerto Rico. All briefs have now been submitted and the matter is at issue.

### TESTIMONY OF DR. RAYMOND HOLMES

CPR moved to strike Dr. Holmes' opinion testimony regarding STC's production processes at its plant in the Mayaguez Industrial Park, Puerto Rico, insofar as it was based on Dr. Holmes hearing the testimony of Sol Colon. On cross examination, Dr. Holmes testified that he had not heard Mr. Colon's testimony. On re-direct, Dr. Holmes testified that he had, indeed, heard at least part of Mr. Colon's testimony and that he had previous conversations with Mr. Colon about the subject and the testimony he did hear was the same as the information previously obtained from Mr. Colon. Dr. Holmes, Mr. Colon and Dwight C. Seeley (inhouse counsel for STC have

each submitted affidavits to the effect that Sol Colon began his testimony at approximately 11:20 a.m. and continued up to the lunch break and returned thereafter. Dr. Holmes was present for all of Mr. Colon's testimony after lunch. The Court notes that the testimony before the lunch break concerned Mr. Colon's qualifications and duties as an independent environmental consultant to STC. He also testified generally as to when he first learned of CPR's claims against STC. He also testified concerning the metal fabrication processes at the plant, the "pit", some of the chemicals used by the Plaintiffs, what tests he had done inside and outside the plant building and how the results of these tests compared with OSHA limits. This was the testimony Dr. Holmes did not hear. After lunch, Mr. Colon's testimony became very specific as to the processes used at the plant and the chemicals used in those processes. He was also subject to extensive cross examination by CPR's counsel on his entire direct examination. Dr. Holmes heard all of Mr. Colon's testimony after the lunch break.

In addition, Dr. Holmes testified, and again stated in his affidavit, that he had extensively interviewed Mr. Colon the evening of January 30, 1990, and the testimony of Mr. Colon the afternoon of January 31, 1990, did not vary from the information given by Mr. Colon the evening of January 30, 1990. Dr. Holmes further states unequivocally in his affidavit that the opinions he expressed in his testimony "were based upon the testimony that I heard from Mr. Colon the afternoon of January 31, 1990."

■■■ Admission of expert testimony is a matter reserved to the trial court's discretion. *Lynch v. Merrell–National Laboratories*, 830 F.2d 1190 (1st Cir.1987). The key question is whether an expert's testimony will assist the trier of fact to understand the evidence or determine a fact issue. Rule 702, F.R.E. Doubts about expert testimony should generally be resolved in favor of admitting the testimony unless there are strong factors indicating incredibility, time, or surprise that would

favor exclusion. *U.S. v. Nersesian*, 824 F.2d 1294 (2nd Cir.1987), *cert. denied* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). No such factors exist here. Therefore, the Court will deny CPR's motion to strike the testimony of Dr. Holmes.

## DEPOSITION TESTIMONY

### *Deposition of Francisco Claudio—January 4, 1990*

The deposition was not sealed as required by Rule 30(f), F.R.Civ.P. It was apparently bound together at one time, but the version submitted to the Court was obviously disassembled and does not contain an original signature of the Certified Shorthand Reporter. In fact, the only original page in the entire document is p. 166 which has the purported original signature of Francisco Claudio. No explanation was given as to why the original document was not submitted.

### *Deposition of Carlos Martinez—January 4, 1990*

The document submitted was not sealed as required by Rule 30(f), F.R.Civ.P. In addition, there is no "Exhibit 1" as designated by CPR, or indeed any exhibit attached to, or included in the document submitted. The only exhibits referred to in the document itself are referred to as "Defendant's 30 and 31" or as "Martinez Exhibits 30 and 31." As with the deposition of Francisco Claudio, the only original, as opposed to copies, of any page is p. 15 which contains the purported original signature of the deponent. There is no original signature of the Certified Shorthand Reporter. No explanation was given as to why the original document was not submitted.

### *Deposition of Ramon Torres—January 3, 1990*

The document is not sealed as required by Rule 30(f), F.R.Civ.P. It is not signed by the deponent, nor is there any indication that the parties waived signature. There is no indication that the deponent was given

an opportunity to review the transcript and make corrections, or that the deponent refused to review and sign the document, all in contravention to Rule 30(e), F.R.Civ.P.

### Deposition of Monserrate Cruz Chaulissant—January 8, 1990

As with the deposition of Ramon Torres, there has been no compliance with Rule 30(e), F.R.Civ.P. The last page contains a "Certificate of Notary Public" that is undated and unsigned. The deposition is unsealed contrary to Rule 30(f), F.R.Civ.P.

### Deposition of Angel Antonio Ramon–Franco—January 25, 1990

The deposition is unsealed contrary to Rule 30(f), F.R.Civ.P. Although it does contain an original signature and seal of the Reporter, it is clearly stamped as a "copy." No explanation was given as to why the original deposition was not submitted. There has been no compliance with Rule 30(e), F.R.Civ.P.

### Deposition of Clyde L. Fasick—January 9, 1990

The deposition is unsealed in contravention of Rule 30(f), F.R.Civ.P. There has been no compliance with Rule 30(e), F.R. Civ.P.

Because the parties submitted these depositions independently and without inspection by the opposition, the Court notified the parties of these defects on May 4, 1990, and gave them ten days to either file written stipulations waving the defects or file appropriate motions under Rule 32(d)(4), F.R.Civ.P. On May 15, 1990, the parties filed a stipulation waiving the defects in all the depositions.

### Deposition Designations and Objections

CPR designated the deposition of Ramon Torres, pp. 4–197, and exhibits thereto. There were no objections, other than as contained in the deposition by STC. Following are the objections (designated by page and line where the objection begins) and this Court's rulings thereon:

P. 23 @ 3—Sustained

P. 25 @ 17—Sustained

P. 26 @ 10—Sustained

P. 30 @ 3—Overruled

P. 30 @ 20—Sustained

P. 32 @ 5—Sustained

P. 32 @ 19—Sustained

P. 38 @ 6—Sustained

P. 39 @ 7—Sustained

P. 40 @ 5—Sustained

P. 41 @ 24—Sustained

P. 43 @ 10—Motion to strike denied

P. 48 @ 24—Overruled

P. 49 @ 15—Sustained

P. 52 @ 14—Overruled

P. 57 @ 11—Sustained

P. 58 @ 23—Sustained

P. 59 @ 19—Sustained

P. 60 @ 15—Sustained

P. 60 @ 21—Sustained

P. 61 @ 24—Overruled

P. 66 @ 9—Sustained

P. 70 @ 18—Sustained

P. 72 @ 22—Sustained

P. 73 @ 9—Sustained

P. 73 @ 18—Sustained

P. 74 @ 11—Sustained

P. 75 @ 5—Sustained

P. 78 @ 4—Overruled

P. 78 @ 22—Overruled

P. 79 @ 9—Overruled

P. 87 @ 3—Sustained

P. 87 @ 18—Sustained

P. 98 @ 12—Sustained

P. 98 @ 22—Sustained

P. 104 @ 24—Sustained

P. 105 @ 12—Overruled

P. 106 @ 5—Overruled

P. 106 @ 20—Sustained

P. 115 @ 12—Sustained

P. 116 @ 7—Motion to strike denied

P. 143 @ 2—Sustained

P. 135 @ 17—Overruled

P. 136b @ 12—Sustained

P. 147 @ 22—Overruled

P. 150 @ 9—Sustained

P. 153 @ 20—Overruled

P. 157 @ 9—Sustained

P. 165 @ 1—Overruled

P. 169 @ 13—Sustained

P. 170 @ 1—Sustained

P. 170 @ 9—Overruled

P. 170 @ 19—Overruled

P. 172 @ 16—Sustained

P. 172 @ 23—Sustained

P. 177 @ 15—Sustained

P. 181 @ 6—Sustained

P. 181 @ 13—Sustained

P. 182 @ 10 & 12—Sustained

P. 182 @ 23—Overruled

P. 187 @ 20—Sustained

P. 189 @ 1—Sustained

P. 189 @ 11 & 14—Sustained

P. 194 @ 24—Sustained

P. 197 @ 9—Sustained

P. 197 @ 17—Sustained

CPR designated the deposition of Carlos Martinez, pp. 4–12, and exhibit 1 thereto. STC designated pp. 13–14. As noted, *supra*, there is no "Exhibit 1." There was reference in the deposition to Exhibits 30 and 31, but there was, in fact, no exhibit accompanying the deposition. Therefore, all testimony derived from these exhibits is stricken.

CPR designated the deposition of Francisco Claudio, pp. 4–66, pp. 145–163, and p. 165, and the exhibits thereto. STC designated pp. 66–145 and the recross examination beginning at p. 164. STC filed specific objections to portions of this deposition on February 9, 1990, in addition to all objections made at the deposition. As to the specific objections filed on February 9, 1990, the Court sustains each and every objection.

As to the objections made at the time of the deposition the court concludes as follows: Deposition Exhibits 15 through 20, 24, and 27 had insufficient foundation, i.e. there was an incomplete foundation under the business records exception to the hearsay rule. The witness also testified that these were the types of records upon which he relied, but he was not tendered as an expert witness to render an opinion, so it matters not that he relied on these types of documents. Therefore, all testimony derived therefrom is stricken. Deposition Exhibits 5 and 28 were not attached to the deposition and the Court has no idea what

they are. Therefore, all testimony derived therefrom is stricken. Deposition Exhibits 25, 26, and 29 are admitted. However, these documents are in Spanish and cannot be reviewed by this judge. However, the testimony of the witness in the deposition based on these documents is admitted, as is the testimony based on Deposition Exhibits 21 through 23.

■ STC designated the deposition of Clyde Fasik and CPR objects to the deposition in its entirety asserting "that the deposition was noted as a records custodian deposition yet [STC] deposed Mr. Fasick on numerous topics other than records keeping. There is nothing in the file, the record, or the deposition to indicate that this was a limited deposition. Indeed, CPR also went far beyond any limited designation in its questioning and never objected at the time to STC's general examination. CPR's objection is overruled. STC asserts that Mr. Pedro Varela, who attended the deposition on behalf of CPR is not admitted to practice before this Court and, therefore, had no standing to assert objections at the deposition. STC did not protest Mr. Varela's standing at the time of the deposition, and the Court rules that STC has thereby waived this objection.

Following are the objections (designated by page and line where the objection begins) and this Court's rulings thereon:

P. 14 @ 17—Overruled

P. 15 @ 20—Sustained

P. 16 @ 6—Overruled

P. 16 @ 12—Sustained

P. 17 @ 4—Sustained

P. 18 @ 19—Overruled

STC designated the deposition of Dr. Angel Antonio Roman–Franco and CPR objects asserting that the deposition was only a discovery deposition and was not noted as a deposition for the perpetuation of testimony. The deposition was noticed by CPR and on p. 16, when Dr. Franco indicated he could not attend trial in Colorado, STC designated the deposition as perpetuation testimony. CPR objected. CPR's objection is overruled. Rule 32(a)(3)(B), F.R.Civ.P., provides that the deposition of a witness,

whether or not a party, may be used by any party for any purpose if the court finds that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the United States. This deposition was taken in Puerto Rico on January 25, 1990, and at p. 16 @ 16, p. 27 @ 11, and p. 28 @ 6, Dr. Franco says it would be impossible for him to attend trial in Colorado because he had to teach his classes in Puerto Rico.

CPR also objects asserting that the deposition is improper rebuttal to any testimony offered by CPR. However, CPR raised the issue of medical summaries in its cross examination of Dr. Holmes. The door being opened by CPR, the testimony of Dr. Franco is proper rebuttal.

Following are the objections (designated by page and line where the objection begins) and this Court's ruling thereon:

P. 14 @ 14—Sustained
P. 28 @ 14—Sustained
P. 36 @ 14—Overruled
P. 40 @ 6—Motion to strike denied
P. 60 @ 24—Sustained
P. 67 @ 3—Sustained
P. 91 @ 8—Motion to strike granted
P. 92 @ 4—Overruled
P. 96 @ 5—Overruled
P. 96 @ 20—Overruled
P. 96 @ 25—Overruled
P. 97 @ 2—Sustained
P. 97 @ 12—Overruled
P. 97 @ 23—Overruled
P. 98 @ 3—Overruled
P. 98 @ 19—Motion to strike denied
P. 99 @ 8—Overruled
P. 100 @ 3—Overruled; Motion to strike granted as to last sentence
P. 100 @ 10—Overruled
P. 100 @ 22—Moot
P. 101 @ 9—Sustained
P. 102 @ 7—Overruled
P. 103 @ 2—Overruled
P. 103 @ 15—Sustained
P. 104 @ 3—Overruled
P. 104 @ 8—Overruled
P. 104 @ 13—Overruled
P. 104 @ 20—Overruled

P. 105 @ 9—Overruled
P. 105 @ 19—Overruled
P. 105 @ 21 & 25—Overruled
P. 106 @ 8—Overruled
P. 106 @ 14—Overruled
P. 106 @ 19—Motion to strike granted
P. 107 @ 11—Overruled
P. 107 @ 14—Overruled
P. 108 @ 9—Overruled
P. 108 @ 12—Sustained
P. 108 @ 17—Sustained
P. 108 @ 21 & 23—Overruled
P. 109 @ 9—Overruled
P. 109 @ 15—Overruled
P. 110 @ 5 & 9—Overruled
P. 110 @ 13 & 17—Overruled
P. 112 @ 19—Motion to strike denied
P. 112 @ 23—Overruled
P. 113 @ 11—Overruled
P. 114 @ 4—Overruled
P. 114 @ 10—Overruled
P. 114 @ 18—Overruled
P. 115 @ 9—Overruled
P. 115 @ 15—Overruled
P. 116 @ 13 & 20—Overruled
P. 117 @ 9—Overruled
P. 117 @ 19—Overruled
P. 117 @ 25—Overruled
P. 118 @ 11—Overruled
P. 118 @ 21—Overruled
P. 119 @ 10—Overruled
P. 119 @ 25—Overruled
P. 120 @ 4—Overruled
P. 120 @ 13—Overruled
P. 121 @ 10—Overruled
P. 121 @ 16 & 22—Moot
P. 122 @ 8—Motion to strike granted
P. 122 @ 15 & 17—Overruled
P. 123 @ 3—Sustained
P. 123 @ 16—Motion to strike denied
P. 124 @ 3 & 10—Overruled
P. 124 @ 18—Sustained
P. 124 @ 22—Overruled
P. 125 @ 1—Overruled
P. 125 @ 10—Motion to strike denied
P. 125 @ 14, 17 & 19—Overruled
P. 126 @ 1—Overruled
P. 126 @ 3—Sustained
P. 126 @ 12—Sustained

618

P. 126 @ 18—Sustained

P. 127 @ 2—Sustained

P. 127 @ 4—Overruled

P. 127 @ 23—Sustained

P. 128 @ 6—Sustained

P. 128 @ 25—Sustained

P. 129 @ 4—Overruled, no question pending

P. 129 @ 20—Overruled

P. 130 @ 7—Sustained

P. 130 @ 10—Overruled

P. 130 @ 20—Overruled

P. 131 @ 5—Overruled

P. 134 @ 7—Overruled

P. 134 @ 10—Overruled

P. 135 @ 1—Overruled

P. 135 @ 6—Overruled

P. 135 @ 11—Overruled

P. 135 @ 24—Overruled

P. 136 @ 5—Overruled

P. 136 @ 21—Overruled

P. 137 @ 8—Overruled

P. 137 @ 13—Overruled

P. 139 @ 3—Overruled

P. 139 @ 8—Overruled

P. 142 @ 11—Overruled

P. 143 @ 12—Overruled

P. 145 @ 8—Overruled

P. 145 @ 11—Motion to strike granted

STC designated the deposition of Monserrate Cruz Chaulissant. CPR made no objections to the deposition or to any of the questions asked in the deposition.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

On October 31, 1984, STC filed four of its Chapter 11 petitions. On November 7, 1984, a fifth petition was filed for STC subsidiary Media Technology Corporation. These five cases are being jointly administered. Each petition, when filed had an attached list of the twenty largest unsecured creditors for each particular entity. On December 21, 1984, the Notices of Meeting of Creditors with Notices of Automatic Stay were filed for each entity. On December 26, 1984, each entity mailed these Notices to those parties listed on Exhibits 6 through 10 and filed a Certificate of Mailing with the Court. As shown by these exhibits, there were literally thousands of creditors receiving these notices. On October 31, 1984, all employees of STC (including those in Puerto Rico) were notified of the bankruptcy filing. (Exhibits 29, 30, and 30A). STC continued to keep its employees apprised of the bankruptcy proceedings. See Exhibits 45 through 60. In addition, STC notified several governmental agencies in Puerto Rico of the bankruptcy proceedings, including the Puerto Rico Economic Development Administration ("PRIDCO"), the Department of Human Resources (the Labor Department), the Treasury Department (taxing authority), and the Puerto Rico Aqueduct and Sewer Authority, a/k/a Autoridad Acueductos y Alcantarillados ("PRASA"). (Exhibit 33).

On May 9, 1985, STC filed a Motion for Order Fixing Deadline To File Proofs of Claim or Interest; Defining Procedure Therefore; and Approving Form and Manner of Notice Thereof. (Exhibit 11). The Creditors Committee, which included creditors from Puerto Rico, the U.S. Trustee, and the Securities and Exchange Commission, all participated in the drafting and approval of the language of the proposed Order Fixing Deadline To File Proofs of Claim. On July 30, 1985, after notice and an opportunity for hearing, this Court entered its Order Fixing Deadline for Filing Proofs of Claim (Exhibit 12) which set October 12, 1985, as the deadline for filing proofs of claims for pre-petition claims. Notice of that order was mailed to all known creditors and reasonably ascertainable creditors. This included all vendors and suppliers, whether or not they were owed money; customers, existing and potential; and employees, past and present. (Exhibit 39).

In addition, the Notice was published in the following newspapers (Exhibits 15 through 25):

The Rocky Mountain News—Denver, Colorado

San Jose Mercury–News—San Jose, California

The Denver Post—Denver, Colorado

The Post and Evening Times—West Palm Beach, Florida

The San Juan Star—San Juan, Puerto Rico

International Herald Tribune—New York, New York

The Wall Street Journal—national distribution

Financial Times Limited, London, England

The Asian Wall Street Journal

The New York Times—New York, New York

The Globe and Mail—Toronto, Canada

All of these publications were in the English language. *The San Juan Star, The Wall Street Journal,* and the *New York Times* are distributed in Mayaguez, Puerto Rico, where the Defendants reside. The Notice in *The San Juan Star* is more than a quarter of the page of the newspaper and is in plain, understandable English. *See* Fasick Deposition Exhibit 1. *The San Juan Star* is a newspaper of general circulation in Puerto Rico and is available in Mayaguez at all newsstands and is also available for daily home delivery. It is available at newsstands or stores at or near the Industrial Park in Mayaguez where STC had its facility. There was no evidence of a newspaper *published* in Mayaguez, but rather, the evidence was that all four newspapers in Puerto Rico are published in San Juan.

On June 18, 1987, this Court entered its Order Confirming Plan and Fixing Deadline for Filing Administrative Claims as July 31, 1987. (Exhibit 26). Notice of that Order, including the deadline for filing administrative claims was sent to all known creditors of STC on June 30, 1987. *See* Exhibits 27 and 28 which are the Notice and the Certificate of Mailing. These Exhibits are copies of a computer listing of the names and addresses of the creditors where approximately 12 to 15 creditors are listed on each page and the documents stand over nine inches high. In addition, notice of this order, and of the deadline for filing administrative claims, was published July 30, 1987, in the following newspapers:

The Denver Post—Denver, Colorado

The Rocky Mountain News—Denver, Colorado

The Wall Street Journal—national distribution

The Financial Times Limited—London, England

International Herald Tribune—New York, New York

The Asian Wall Street Journal

STC's Plan of Reorganization was effective July 18, 1987.

Notice of STC's bankruptcy filing and of the Order Fixing Deadline for Filing Proofs of Claim was mailed to PRASA (Exhibits 14 and 33) which was a party to an action filed in Puerto Rico in 1985 by CPR relating to the claims *sub judice.*

These same notices were mailed to the Department of Human Resources (the Labor Department) in Puerto Rico. This Department was a party to the same 1985 action, *supra.* The Department did file a proof of claim in STC's bankruptcy case for certain employment taxes. No claim was filed relating to the claims of CPR. (Exhibit 65).

PRIDCO owns the buildings and the land at the location of the STC facility in Mayaguez, Puerto Rico, and was the landlord of STC. PRIDCO filed a proof of claim in STC's bankruptcy case for rents, but no claim was filed for the types of claims asserted herein by CPR. PRIDCO, at the time it filed its proof of Claim was also a party in the 1985 action.

In addition, STC published notice of the Order Fixing Deadline for Filing Proofs of Claim in the *Storage Technology News,* which goes to all employees (Exhibit 62), and in the *Storage Technology Buy–Line,* which goes to suppliers (Exhibit 64). A reminder of the deadline was published in the *Storage Technology Buy–Line,* on September 27, 1989.

Until November, 1987, STC was not a party to any action filed by CPR.

In November, 1987, (three years after the bankruptcy filing, two years after the deadline for filing proofs of claim for prepetition claims, and three months after the deadline for filing post-petition claims) CPR filed a civil action against STC, and others, in the U.S. District Court for the District of Puerto Rico, Civil Action No. 87–1643. The Complaint in that civil action alleges that in the Industrial Complex of Guanajibo–Castillo in Mayaguez, Puerto Rico, "Beginning in 1983 a number (more than a dozen) of extremely high releases of toxic substances occurred at the Industrial Complex, resulting in severe exposure to one or more of the Plaintiffs. Each Plaintiff has been exposed to at least one of these high toxic substance release events ... These high toxic substance events have continued; the most recent event occurred in October, 1987." The Puerto Rican Complaint alleges that the companies named therein are responsible for these "high toxic substance releases." Among those named as responsible is STC. STC did operate a manufacturing facility in the Industrial Complex up to December, 1989. The Puerto Rican Complaint alleges negligence, violation of Resources Conservation and Recovery Act ("RCRA") [no citation given], nuisance, trespass, and strict liability. The Plaintiffs in the Puerto Rico action (CPR here) are alleged to be either workers in the Industrial Complex or residents of the neighborhood surrounding the Complex. They seek actual and punitive damages, injunctive relief, and daily penalties under RCRA.

STC in the within Complaint alleges that to the extent that any of these Puerto Rican claims arose from acts of STC which occurred prior to June 18, 1987, such claims are discharged, and thus forever barred, in this bankruptcy proceeding. STC seeks a declaratory judgment to that effect, and a permanent injunction against CPR from prosecuting any action on such claims.

The Answer and Counterclaims of CPR asserts that these claims were not discharged in this bankruptcy proceeding, but if they were, then CPR was denied due process under the Fifth Amendment to the U.S. Constitution by not having received any notice or meaningful opportunity to participate in these bankruptcy proceedings. CPR also alleges that "The Claims of Defendants were completely unknown to Plaintiffs at the time of the filing of their bankruptcy cases, and were not discovered or made known to Plaintiffs until the time periods within which Defendants might have still participated meaningfully in Plaintiffs' bankruptcy cases had passed ... The existence of claims of Defendants, through no fault or responsibility of their own, was not readily ascertainable, determinable or otherwise known to them, until the time periods within which Defendants could have participated meaningfully in Plaintiffs' bankruptcy cases had passed ... It would be manifest injustice to permit Plaintiffs, who likewise did not know of Defendants' claims, to assert a discharge against creditors who did not have knowledge of their claims, ..."

On September 29, 1989, STC filed its Amended Complaint herein because on or about August 10, 1989, CPR added STC as an additional defendant to a case that had been filed in the Superior Court of Mayaguez, Puerto Rico, Civil Action 86–269. That action had been filed in August, 1986, makes the same basic allegations sounding in negligence and strict liability, and violation of Puerto Rican environmental laws, as does the action before the U.S. District Court, and seeks monetary damages and injunctive relief. STC makes the same allegations that these claims are likewise discharged and barred. As stated, *supra*, CPR has never filed an Answer to this Amended Complaint.

### Applicability of Mullane

In *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), The Supreme Court held that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." At the conclusion of the trial, this Court, *sua sponte*,

raised the issue of whether or not the *Mullane* case was applicable to the citizens of Puerto Rico.

On December 10, 1898, Spain ceded Puerto Rico to the United States by the Treaty of Paris. From that time forward until 1952 Congress exercised the prerogatives granted to it under the Treaty of Paris through (1) the Organic Act of April 12, 1900; and (2) the Organic Act of March 2, 1917 which provided for the internal government of Puerto Rico. However, Congress took no action to incorporate Puerto Rico into the United States and it was unclear which, if any, of the provisions of the U.S. Constitution applied to Puerto Rico. In *Balzac v. Puerto Rico*, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922), the Supreme Court held that the basic rights in the 5th Amendment had full applicability to the Philippines and to Puerto Rico.

In 1950, Congress enacted Public Law 600, 64 Stat. 319 (codified at 48 U.S.C. §§ 731b–731e (1981)) for the purpose of allowing a constitutional government by the people of Puerto Rico. This law allowed the citizens of Puerto Rico to adopt their own constitution. In 1952, upon the approval of Congress, the Constitution of the Commonwealth of Puerto Rico became effective subject to the "applicable provisions of ... the Constitution of the United States." 48 U.S. § 731d.

In *Mora v. Mejias*, 206 F.2d 377, 382 (1st Cir.1953), the Court held that ... [T]he people of Puerto Rico, who remain United States citizens are entitled to invoke against the Commonwealth of Puerto Rico the protection of the fundamental guaranty of due process of law, as provided in the federal Constitution ..." Then in 1982 in *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982), the Supreme Court held that the fundamental protections of the U.S. Constitution extend to the inhabitants of Puerto Rico. Thus, this Court concludes that the *Mullane* doctrine extends fully to the people of Puerto Rico.

■ One basis for CPR's assertion that adequate notice was not given to these defendants is that all of the notices mailed

or published by STC were in English and that the notices should have been provided in Spanish for those living in Puerto Rico. The Court takes judicial notice of the fact that Spanish is the native language of the people in Puerto Rico.

The evidence at trial was that it made no difference to the employees of STC in Puerto Rico whether the notices were in Spanish or English because they read and spoke both languages. In fact, employees of STC in Puerto Rico did file proofs of claim for such things as severance and vacation pay. There has been no action filed by an STC employee alleging that notice was inadequate or untimely. When STC published "Help Wanted" notices in Puerto Rico, they were published in English.

But, it is argued, these defendants were not employees of STC, and, therefore, notices in English were not reasonably calculated to reach these defendants. The evidence showed the following. The vast majority of the evidence presented in this case, both oral and written, was in English. The *only* defendant to testify herein (Monserrate Cruz Chaulissant) can speak and read English. Section 42 of The Federal Relations Act of Puerto Rico provides that all proceedings and all pleadings in Federal District Court shall be English. (Exhibit 69). Section 51 (Official Languages) of the Laws of the Commonwealth of Puerto Rico provides that in all public offices English and Spanish shall be used indiscriminately. English is a mandatory course of study for all students through grade twelve in Puerto Rican public schools. *See* Exhibits 71, 72, 74, 75, 76, and 77. There was absolutely no evidence presented that any of the defendants herein did not speak, read, and understand English. Based on this evidence, this Court finds that failure to provide notice in Spanish in Puerto Rico did not deprive claimants or potential claimants of their due process rights.

■ The question then becomes did STC know, or should it have known, that the claims of these Defendants existed, or even potentially existed, such that, under *Mullane, supra*, additional efforts should have been undertaken by STC to provide notice

to these claimants? To decide this issue, the evidence must be examined to determine exactly what STC knew at the time the notices were published. The evidence showed the following.

STC operated its facility in the Industrial Complex from 1980 to December, 1989. There are a total of 33 firms located in the Industrial Complex. All of the Defendants were either employed in the Complex, or were residents of the neighborhood of the Complex. None of the Defendants were ever employees of STC. In fact, no employee of STC ever mentioned being overcome, affected, irritated, or even annoyed by any gas incident, within or without STC's facility.

On March 23, 1983, an ammonia leak occurred at one of the firms in the Complex (Cerveceria India, Inc.—"India"). On August 10, 1983, there was a propane leak at India and at least 25 people were affected at the Angus firm. STC knew of these incidents either through the news media or from PRIDCO, but did not know specific details and did not know the extent of injuries, if any. STC had nothing to do with either of these incidents.

Between 1984 and the present there have been approximately 60 "incidents" in the Complex. An "incident" is defined as anything from one employee reporting to her supervisor that she was nauseated, to several employees taking ill and seeking medical attention. These incidents occurred at nine of the firms in the Complex, none of which were STC. STC was generally aware of the incidents through the news media, but did not know any of the details. On some occasions, STC personnel did observe ambulances responding to the Complex. Between March 22, 1985 and April 24, 1986, there were no incidents and no incident ever occurred at the STC facility.

On February 29, 1984, the STC facility was inspected by the Environmental Quality Board of Puerto Rico ("EQB") because STC had requested an operations permit. This was a routine inspection. STC received the requested permits and heard nothing else from EQB until almost a year later (January 18, 1985) when STC received a "notice of deficiency" from EQB. The notice stated that STC was operating an oven which used propane gas and that STC had two tanks for the storage of the gas and that STC was storing diesel fuel, all without the proper permits. Ten days later STC responded to this notice explaining that in August, 1983, STC had submitted an application for construction of emission sources pursuant to EQB regulations which included a wave solder polyclean machine, an emergency power generator, two paint booths, and one oven, and was given permission to proceed. Therefore, STC argued, it was not in violation of the rules requiring a permit with respect to the oven or the storage of diesel fuel. STC also pointed out that the propane tank was a closed system and, therefore, there were no emissions from the tank. It was for this reason the tank was not included in the 1983 application. STC believed that no permit was required for the tank. EQB responded on March 7, 1985, and acknowledged that STC was correct, except for the propane tank. EQB also acknowledged that the diesel tank was not considered an emission source. Thereafter, STC obtained a permit for the propane tank. The EQB never indicated that any of these "deficiencies" (i.e. the lack of the proper permits) had caused any adverse health effects or injury to anyone.

Sometime in 1984 STC was represented at a meeting of all the firms in the Complex called by the EQB in response to the incidents that had occurred. At this meeting, the firms were given questionnaires to fill out and return which requested a list of every chemical used by each firm in the Complex. STC complied with the request and heard nothing more.

Sometime prior to February 4, 1985, employees of EQB performed "smoke tests" in the sanitary sewer system of the Complex, *none of which were performed on STC property.* In such tests smoke is introduced into the system in order to detect any possible leaks of gaseous material from the system. STC was never informed of the results of these tests. There was an internal EQB report concerning these tests,

but it was never offered to STC, nor was STC ever informed of its contents.

In April, 1985, a second smoke study was carried out at the Complex. Again, there was an internal EQB memo on the results of that test, but it was never offered to STC, nor was STC ever informed of its contents.

In February, 1986, a third smoke test was performed at the Complex. In July, 1986, STC was informed that it should install "traps" or "valves" in the sanitary sewer system on its property. These "traps" are designed to prevent noxious gases from *entering* the STC facility from the system and STC installed them almost immediately.

Part of STC's process was to finish and paint metal frames for computer products. The process included dipping the frames into a tub of methylene chloride, removing them and allowing them to dry; dipping the frames into a tub of chromic acid, removing them and allowing them to dry; dipping the frames into a tub of sulfuric acid, removing them and allowing them to dry; and finally dipping them into two rinse water tanks. The evidence showed that there was an overflow of water from the rinse tubs to a small sedimentary basin outside the STC building and that rinse water from this basin *could* have overflowed into the sewer system if the water in it got high enough. However, there was no evidence that this ever occurred. In 1983 and 1984 STC had the contents of this basin analyzed by an independent laboratory. The report showed that the samples were within PRASA effluent requirements and had no toxic characteristics. The evidence also was that this entire process remained constant throughout STC's operation of the facility. Once a status or condition is shown to exit (in this case the non-toxicity of the basin contents) such condition is presumed to continue until contrary evidence is produced. No such evidence was produced here. Thus, I find that STC was entitled to rely on the 1984 and 1985 tests.

STC used a chemical known as 1–1–1 trichloromethane, which is an organic solvent. It used this chemical in two different processes. First, it immersed printed circuit boards into a *closed* tank to clean them. It also used small quantities of the chemical by applying it with a brush to metal frames or by applying it with a "Q-tip" to printed circuit boards. The evidence showed that before any person outside STC's facility could have been harmed by this chemical used in the STC facility, STC employees would have been affected first. As stated *supra*, no employee ever complained of *any* effects of exposure to this chemical or any other chemical.

Once the metal frames were cleaned, they were painted in a standard paint booth where emissions were discharged into the outside air. STC did its own internal mass balance calculations regarding these emissions which showed that the discharge concentrations from the exhaust stacks could not have exceeded 0.9 ppm for all organic materials. This is well below the odor threshold (i.e. below the concentration where anyone could even smell the substance) for all the materials used and well within all regulatory standards. The EQB did request STC to raise the height of the exhaust stacks (which STC did almost immediately), but the EQB also told STC that its exhaust stacks were not the cause of any "incidents."

In June, 1984, the EQB performed an inspection of the STC facility. According to the memorandum of EQB (which was never given to STC) the types of deficiencies noted would not cause harm to anyone. The deficiencies were mainly related to the lack of proper documentation on site. No notice of deficiency or violation was ever sent to STC regarding this inspection.

STC had "in house" industrial health employees monitoring its environmental responsibilities, and it had environmental consultants on a contract basis doing the same thing. Periodic audits of STC's facilities were conducted by these people, and at no time was there any indication that STC's processes were even remotely connected to the "gas incidents" at the Complex or even contributed to these incidents in any fashion.

The first time STC had any knowledge that any claims might be asserted against it in connection with the gas incidents was in November, 1987, when CPR commenced the action in the U.S. District Court in Puerto Rico. These same Defendants had earlier commenced a mandamus action in 1985 against the EQB and various other agencies of Puerto Rico. STC was not aware of this suit and was not a party to this suit. In 1986 these Defendants filed suit against several firms in the Complex in the Puerto Rican court. STC was not a party and was not served in this action and had no notice of it.

This is the sum and substance of what STC knew at the time the notices were mailed and published. There was no evidence that STC knew that employees in the Complex, or neighbors of the Complex, had any injuries that would give rise to claims against it, i.e. that STC *caused*, in any fashion or to any degree, any injury to anyone.

The only evidence presented that STC might remotely have contributed to any of these "injuries" (I use the term "injuries" loosely because there was absolutely no evidence that any of these Defendants suffered any injury) came from Dr. Garcia. Dr. Garcia never performed tests of his own, but relied upon three reports prepared by governmental agencies and the Puerto Rico College of Engineering. Dr. Garcia has a theory that there *may* have been some synergistic effect of the mixture of the chemicals in the air or in the sewer from the various firms in the Complex that caused illness. Dr. Garcia admitted that this theory is not generally accepted in the scientific community. Dr. Garcia presented no reliable underlying data for his novel opinion. Therefore, this Court cannot accept his opinion or theory as anything but conjecture. This, coupled with the fact that not one shred of evidence was presented concerning any "injury" to any one of these Defendants leads this Court to the conclusion that their "injuries" and thus their claims are nothing but conjectural.

In light of this knowledge, did the procedures used by STC comport with the teachings of *Mullane, supra?* I think they did. The Supreme Court in *Mullane* held that notice by publication was sufficient for those parties whose whereabouts could not with due diligence be ascertained, *even though the publication would probably never reach the eyes of these parties.* As to known parties, the Supreme Court held that serious effort must be made to give actual notice by first class mail. STC did give actual notice by first class mail to every potential claimant whose name and address was on their books. As to unknown claimants STC went beyond the requirements of *Mullane.* *Mullane* upheld notice by publication in only New York state for out-of-state unknown claimants. Here, STC published in three newspapers available in the very city where these Defendants live and work. These Defendants had no prior relationship with STC. *Mullane* held that even if conjectural or future claimants could be discovered upon investigation, notice by publication was nevertheless sufficient if the identity and whereabouts of these claimants did not come to the knowledge of the person giving the notice in the due course of business.

Defendants' own pleadings state that the claims asserted by these Defendants were completely unknown to STC and were not discovered or made known to STC until the bar dates had passed. The evidence at trial has convinced this Court that STC did not know of any of these claims nor did STC have knowledge of any facts that would lead anyone, reasonable or otherwise, to the conclusion that there *may be* a *potential* claim by any of these Defendants. Further, the Court concludes that even if there may have been some hint that there may be claims lurking around because of these "gas emissions", STC did all that is required, and more, under *Mullane, supra.* Rather, the record shows that these Defendants did know they had claims against someone in the Complex as early as 1985 when they filed an action against the Puerto Rican governmental agencies seeking to have redress for their alleged injuries. Yet they stood silent until STC's reorganization plan was approved and substantially consummated before they came forward.

■ Thus, this Court concludes that the "claims" (as defined in 11 U.S.C. § 101(4)) are barred by their failure to file timely proofs of claim for all pre-petition claims. "Pre-petition claims" are defined as those claims for which the triggering act, i.e. the "gas emission," occurred prior to October 31, 1984. *See, e.g., Grady v. A.H. Robins*, 839 F.2d 198, (4th Cir.1988). This Court, as did Judge Patricia Clark in *In re Grynberg*, 113 B.R. 709, (Bankr.Colo.1990), 00821 C, April 16, 1990, rejects the holding of *In the Matter of M. Frenville Co.*, 744 F.2d 332 (3rd Cir.1984). For the same reasons, all "claims" of these Defendants that arose between October 31, 1984, and the date of confirmation of STC's plan of reorganization, i.e. administrative priority claims, are barred for the non-filing of appropriate timely proofs of claim.

The pleadings in the Puerto Rican courts filed by these Defendants may however, raise the possibility of claims "arising" against STC for "gas emissions" that occurred in the Complex *after* June 18, 1987. This Court cannot make any determination as to these "claims" (because no evidence was presented at trial as to *when* any of these claims "arose"), nor need it do so. The Courts in Puerto Rico have at least concurrent jurisdiction with this Court to determine such claims. *Paradise Valley Country Club v. Sun Valley Development*, 26 B.R. 990 (Bankr.Colo.1983), *aff'd* Dist. Colo. Civil Action No. 83 K 496, June 29, 1983. It is, therefore,

ORDERED that judgment shall enter in favor of the Plaintiffs and against the Defendants and that all claims these Defendant may have against the Plaintiffs that arose prior to June 18, 1987, are discharged herein and are forever barred.

FURTHER ORDERED that Defendants are permanently enjoined from prosecuting any claims that arose prior to June 18, 1987, they may have against the Plaintiffs in any manner and in any forum.