PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 09-1563

———

In re: Grossman's Inc., et al.,
Debtors

JELD-WEN, Inc., f/k/a Grossman's Inc.,
Appellant
v.

Gordon Van Brunt, Individually and in his capacity as
Personal Representative of the Estate of Mary Van Brunt*

*Amended pursuant to Fed. R. App. P. 43

———

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-08-cv-00427)
District Judge: Honorable Joseph J. Farnan, Jr.

———

Submitted Under Third Circuit LAR 34.1(a)
February 10, 2010
Before: SLOVITER, ROTH, and TASHIMA,* Circuit Judges

Resubmitted En Banc April 27, 2010
Before: McKEE, *Chief Judge*, SLOVITER, SCIRICA, BARRY
AMBRO, FUENTES, SMITH, FISHER, CHAGARES,
JORDAN, HARDIMAN, GREENAWAY,

———

> * Honorable A. Wallace Tashima, Senior Judge of the
United States Court of Appeals for the Ninth Circuit, sitting by
designation.

VANASKIE and ROTH, *Circuit Judges*

(Filed: June 2, 2010)

____

Christopher M. Alston
Foster Pepper PLLC
Seattle, WA 98101

Frederick B. Rosner
Messana Rosner & Stern LLP
Wilmington, DE 19801

      Attorneys for Appellant

Sander L. Esserman
David J. Parsons
Cliff I. Taylor
Stutzman, Bromberg, Esserman & Plifka, P.C.
Dallas, TX 75201

Daniel K. Hogan
Wilmington, DE 19806

      Attorneys for Appellee

_____

OPINION OF THE COURT

_____

SLOVITER, *Circuit Judge*.

This Court's Internal Operating Procedure provides:

It is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a precedential opinion of a previous panel. Court en banc

2

consideration is required to do so.

Third Circuit I.O.P. 9.1. We adhere strictly to that tradition. It is only on a rare occasion that we overrule a prior precedential opinion. We assemble en banc to consider whether this is such an occasion.

In the appeal before us, the Bankruptcy Court, affirmed by the District Court, followed our precedent in *Avellino & Bienes v. M. Frenville Co. (Matter of M. Frenville Co.)*, 744 F.2d 332 (3d Cir. 1984) ("*Frenville*"), to hold that a plan of reorganization did not discharge asbestos-related tort claims filed by Mary Van Brunt and her husband Gordon (the "Van Brunts") against Grossman's Inc. The underlying asbestos exposure occurred pre-petition but the injury manifested itself post-petition. The Appellant, JELD-WEN, Inc., successor to defendant Grossman's Inc. and its affiliates (hereafter "Grossman's"), asks us to overrule the holding of *Frenville*.

## I.

### Background

In 1977, Appellee Mary Van Brunt, who was remodeling her home, purchased products that allegedly contained asbestos. She purchased those products in upstate New York from Grossman's, a home improvement and lumber retailer. In April 1997, Grossman's filed petitions under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq.*

The following are among the undisputed facts set forth in the Bankruptcy Court's Findings of Fact: "[a]t the time of the [bankruptcy], Grossman's had actual knowledge that it had previously sold asbestos containing products such as gypsum board and joint compound"; "Grossman's knew of the adverse health risks associated with exposure to asbestos"; it "was aware that asbestos manufacturers had been or were being sued by asbestos personal-injury claimants"; it "was aware that producers of both gypsum board and joint compound were being sued for asbestos-related injuries"; and it "was not aware of any product

3

liability lawsuits based upon alleged exposure to asbestos-containing products that had been filed against [it] . . . ." App. at 20-21.

Grossman's proceeded to provide notice by publication of the deadline for filing proofs of claim. There was no suggestion in the publication notice that Grossman's might have future asbestos liability. Grossman's Chapter 11 Plan of Reorganization purported to discharge all claims that arose before the Plan's effective date. The Bankruptcy Court confirmed the Plan of Reorganization in December 1997.

Ms. Van Brunt did not file a proof of claim before confirmation of the Plan of Reorganization because, at the time, she was unaware of any "claim" as she manifested no symptoms related to asbestos exposure. It was only in 2006, almost ten years later, that Ms. Van Brunt began to manifest symptoms of mesothelioma, a cancer linked to asbestos exposure. She was diagnosed with the disease in March 2007.

Shortly after her diagnosis, the Van Brunts filed an action for tort and breach of warranty in a New York state court against JELD-WEN, the successor-in-interest to Grossman's,[1] and fifty-seven other companies who allegedly manufactured the products that Ms. Van Brunt purchased from Grossman's in 1977. Ms. Van Brunt conceded that she did not know the manufacturer of any of the products that she acquired from Grossman's for her remodeling projects in 1977. After the Van Brunts filed their suit, JELD-WEN moved to reopen the Chapter 11 case, seeking a determination that their claims were discharged by the Plan. Ms. Van Brunt died in 2008 while the case was pending. Gordon Van Brunt has been substituted in her stead as the representative of her estate.

The Bankruptcy Court concluded that the 1997 Plan of Reorganization did not discharge the Van Brunts' asbestos-

---

[1] Through the Plan, JELD-WEN acquired all of the stock of, and subsequently merged with, Grossman's.

related claims because they arose after the effective date of the Plan.[2] *JELD-WEN, Inc. v. Van Brunt (In re Grossman's, Inc.)*, 389 B.R. 384, 388 (Bankr. D. Del. 2008) ("*In re Grossman's I*"). In so holding, the Bankruptcy Court relied on our decisions in *Frenville* and its progeny. *Id.* at 388-90 (citing *Frenville*, 744 F.2d at 337; *Schweitzer v. Consol. Rail Corp.,* 758 F.2d 936 (3d Cir. 1985)). *Frenville* held that a "claim," as that term is defined by the Bankruptcy Code, arises when the underlying state law cause of action accrues. 744 F.2d at 337 (citing 11 U.S.C. § 101(4)(1982)). The applicable New York law provides that a cause of action for asbestos-related injury does not accrue until the injury manifests itself. *In re Grossman's I*, 389 B.R. at 388 (citations omitted). The Bankruptcy Court therefore reasoned that the Van Brunts had no "claim" subject to discharge in 1997 because Ms. Van Brunt did not manifest symptoms of mesothelioma – and thus the New York cause of action did not accrue – until 2006. *Id.* The Bankruptcy Court entered judgment for the Van Brunts and against JELD-WEN, effectively allowing the Van Brunts to proceed with their claims in the New York state court.[3] *Id.* at 390.

---

[2] Grossman's had also filed for bankruptcy in the Florida bankruptcy courts in 1985. After losing in the Delaware Bankruptcy Court, JELD-WEN re-opened the Florida bankruptcy case in hopes of a better result. *See JELD-WEN, Inc. v. Van Brunt (In re Evans Prods. Co.)*, No. 08-01643-AJC, 2009 WL 2448145, at *2 (Bankr. S.D. Fla. Aug. 6, 2009). However, the bankruptcy court in that case also granted judgment in favor of the Van Brunts. *See id.* The Florida district court has stayed an appeal of the bankruptcy court's decision, reasoning that a ruling by this court could render those proceedings moot. *See JELD-WEN, Inc. v. Van Brunt (In re Evans Prods. Co.)*, No. 09-22920 (S.D. Fla. Jan. 19, 2010) (order granting stay).

[3] JELD-WEN is the only defendant remaining in the New York action, which has been informally stayed pending this appeal. In response to this court's inquiry, the Van Brunts report that they reached a settlement with four of the defendants for an aggregate amount of $305,850, and that their claims against the other defendants were dismissed.

The District Court affirmed the Bankruptcy Court's decision in every respect but one. *See JELD-WEN v. Van Brunt (In re Grossman's, Inc.)*, 400 B.R. 429, 433 (D. Del. 2009) ("*In re Grossman's II*"). The District Court reversed the Bankruptcy Court's conclusion that the breach of warranty claim arose post-petition, reasoning that the claim accrued under New York law at the time of delivery of the product and was discharged in the Grossman's bankruptcy. *Id.* at 432. The Van Brunts have not appealed that determination. Instead, JELD-WEN appeals the District Court's affirmance of the Bankruptcy Court's holding that the Van Brunts' tort claims were not "claims" under 11 U.S.C. § 101(5).

## II.

### Statement of Jurisdiction and Standard of Review

The Bankruptcy Court had jurisdiction under 28 U.S.C. § 157, and the District Court had jurisdiction under 28 U.S.C. §§ 158 and 1334. We have jurisdiction under 28 U.S.C. §§ 158(d)(1) and 1291. We exercise plenary review over the District Court's appellate review of the Bankruptcy Court's decision.[4] *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 389 n.3 (3d Cir. 2009) (citation omitted). We review the Bankruptcy Court's findings for clear error, and apply plenary review to its conclusions of law. *In re Handel*, 570 F.3d 140, 141 (3d Cir. 2009).

## III.

### Discussion

### A.    The *Frenville* Accrual Test

[4] JELD-WEN also appeals the District Court's decision not to sanction the Van Brunts for pursuing a breach of warranty claim in the Bankruptcy Court. We review that decision for abuse of discretion. *Rogal v. Am. Broad. Cos.*, 74 F.3d 40, 44 (3d Cir. 1996). We have considered JELD-WEN's arguments and find them unpersuasive.

6

In 1980, M. Frenville Co. was the subject of an involuntary petition for bankruptcy filed in New Jersey under Chapter 7 of the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 701 *et seq.* (the "Code"). *See Frenville*, 744 F.2d at 333. Thereafter, involuntary petitions under Chapter 7 of the Code were filed against two principals of the company.[5]  *Id.*

Later that year, four banks filed a lawsuit in a New York state court against the company's former accountants, Avellino & Bienes ("A & B"), alleging that A & B negligently and recklessly prepared the company's pre-petition financial statements and seeking damages for their alleged losses exceeding five million dollars. *Id.* at 333-34.  A & B filed a complaint in the bankruptcy court in New Jersey seeking relief from the automatic stay in order to implead Frenville as a third-party defendant in order to obtain indemnification or contribution under New York law. *Id.* at 333-34.  The bankruptcy court, affirmed by the district court, held that the automatic stay barred A & B's action. *Id.* at 334.  A & B appealed.

We reversed, holding that because the automatic stay applied only to claims that arose pre-petition, under New York law A & B did not have a right to payment for its claim for indemnification or contribution from Frenville until after the banks filed their suit against A & B. *Id.* at 337.  It followed that A & B's claim against Frenville arose post-petition even though the conduct upon which A & B's liability was predicated (negligent preparation of Frenville's financial statements) occurred pre-petition. *Id.* at 336-37.  It followed that the automatic stay was inapplicable.  We emphasized that the "crucial issue" was when the "right to payment" arose as determined by reference to the New York law that governed the indemnification claim. *Id.* at 336.

This court subsequently summarized *Frenville* as holding

_____

[5] One of those principals, Rudolph Frenville, Sr., will be collectively referred to, along with the company, as "Frenville."

that "the existence of a valid claim depends on: (1) whether the claimant possessed a right to payment; and (2) when that right arose" as determined by reference to the relevant non-bankruptcy law. *Kilbarr Corp. v. Gen. Servs. Admin., Office of Supply & Servs. (In re Remington Rand Corp.)*, 836 F.2d 825, 830 (3d Cir. 1988) (citing *Frenville*, 744 F.2d at 336). The *Frenville* test for determining when a claim arises has been referred to as the "accrual test."

In the case before us, the District Court and Bankruptcy Court correctly applied the accrual test in holding that the Van Brunts' tort claims were not discharged by the Plan of Reorganization. According to *Frenville*, the claims arose for bankruptcy purposes when the underlying state law cause of action accrued. *See Frenville*, 744 F.2d at 337. The New York tort cause of action accrued in 2006 when Ms. Van Brunt manifested symptoms of mesothelioma.[6] The claims were therefore post-petition under *Frenville*.

The question remains, however, whether we should continue to follow *Frenville* and its accrual test. We have recognized that "[s]ignificant authority [contrary to *Frenville*] exists in other circuits . . . ." *Jones v. Chemetron Corp.*, 212 F.3d 199, 205-06 (3d Cir. 2000). A sister circuit has described our approach in *Frenville* as "universally rejected." *Cadleway Props., Inc. v. Andrews (In re Andrews)*, 239 F.3d 708, 710 n.7 (5th Cir. 2001). The courts of appeals that have considered *Frenville* have uniformly declined to follow it. *See Watson v. Parker (In re Parker)*, 313 F.3d 1267, 1269-70 (10th Cir. 2002); *In re Andrews*, 239 F.3d at 710 n.7; *Am. Law Ctr. PC v. Stanley (In re Jastrem)*, 253 F.3d 438, 442 (9th Cir. 2001); *Epstein v. Official Comm. of Unsecured Creditors of the Estate of Piper Aircraft Corp. (In re Piper Aircraft, Corp.)*, 58 F.3d 1573, 1576 n.2 (11th Cir. 1995); *Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 8 n.9 (1st Cir. 1992); *Grady v. A.H. Robins Co.*, 839 F.2d 198, 200-02 (4th Cir. 1988); *see also*

---

[6] The parties agree that the tort claim is governed by New York law.

*Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air. Corp. (In re W.R. Grace & Co.)*, 281 B.R. 852, 860 (Bankr. D. Del. 2002) ("*Frenville* has proved a remarkably unpopular decision and no other Circuit Court of Appeals has followed it."). At least one bankruptcy court has stated that *Frenville* "may be fairly characterized as one of the most criticized and least followed precedents decided under the current Bankruptcy Code." *Firearms Imp. & Exp. Corp. v. United Capital Ins. Co. (In re Firearms Imp. & Exp. Corp.)*, 131 B.R. 1009, 1015 (Bankr. S.D. Fla. 1991); *see also In re Pan Am. Hosp. Corp.*, 364 B.R. 839, 843 (Bankr. S.D. Fla. 2007) (noting that the decision has "been sharply criticized and widely rejected by other courts").

In addition to the cases cited above, JELD-WEN cites numerous district court and bankruptcy court decisions that have declined to follow *Frenville*.[7] The criticism has been echoed by commentators. *See, e.g.*, Ralph R. Mabey & Annette W. Jarvis,

---

[7] *See, e.g.*, *Jensen v. Cal. Dept. of Health Servs. (In re Jensen)*, 127 B.R. 27, 30-31 (B.A.P. 9th Cir. 1991), *aff'd*, 995 F.2d 925 (9th Cir. 1993); *Lovett v. Honeywell, Inc. (In re Transp. Sys. Int'l, Inc.)*, 110 B.R. 888, 894 (D. Minn. 1990), *aff'd*, 930 F.2d 625 (8th Cir. 1991); *Storage Tech. Corp. v. Comite Pro Rescate de la Salud (In re Storage Tech. Corp.)*, 117 B.R. 610, 625 (Bankr. D. Colo. 1990); *Danzig Claimants v. Grynberg (In re Grynberg)*, 113 B.R. 709, 712 (Bankr. D. Colo. 1990), *aff'd*, 143 B.R. 574 (D. Colo. 1990), *aff'd*, 966 F.2d 570 (10th Cir. 1992); *In re Diamond Mortgage Corp. of Ill.*, 105 B.R. 876, 878 n.4 (Bankr. N.D. Ill. 1989); *In re Prod. Plating, Inc.*, 90 B.R. 277, 284 (Bankr. E.D. Mich. 1988); *Levy v. Bank of the Orient (In re Levy)*, 87 B.R. 107, 109 (Bankr. N.D. Cal. 1988); *In re Amfesco Indus., Inc.*, 81 B.R. 777, 781-83 (Bankr. E.D.N.Y. 1988); *Acevedo v. Van Dorn Plastic Mach. Co.*, 68 B.R. 495, 497-98 (Bankr. E.D.N.Y. 1986); *Roach v. Edge (In re Edge)*, 60 B.R. 690, 701-05 (Bankr. M.D. Tenn. 1986); *In re Black*, 70 B.R. 645, 647-51 (Bankr. D. Utah 1986); *Baldwin-United Corp. v. Paine Webber Group, Inc. (In re Baldwin-United Corp.)*, 57 B.R. 759, 764-66 (S.D. Ohio 1985); *In re Yanks*, 49 B.R. 56, 59 (Bankr. S.D. Fla. 1985).

In re Frenville*: A Critique by the National Bankruptcy Conference's Committee on Claims and Distributions*, 42 Bus. Law. 697 (1987).

Notwithstanding what appears to be universal disapproval, we decide cases before us based on our own examination of the issue, not on the views of other jurisdictions. Nevertheless, those widely held views impel us to consider whether the reasoning applied by our colleagues elsewhere is persuasive.

Courts have declined to follow *Frenville* because of its apparent conflict with the Bankruptcy Code's expansive treatment of the term "claim." The Bankruptcy Code, which was adopted by the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978), defines a "claim" as

> [a] right to payment, whether or not such right is reduced to judgment, liquidated, *unliquidated*, fixed, *contingent*, matured, *unmatured*, disputed, undisputed, legal, equitable, secured, or unsecured . . . .

11 U.S.C. § 101(5) (2008) (emphasis added). The House and Senate Reports make explicit that the effect of the definition "is a significant departure from [then] present law" which did not define "claim." H.R. Rep. No. 95-595, at 309 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266; S. Rep. No. 95-989, at 21, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5807. In adopting the new definition of "claim," the Reports state that "[b]y this *broadest possible definition* [of the term 'claim'] . . . the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case . . . [and] permits the broadest possible relief in the bankruptcy court." H.R. Rep. No. 95-595, at 309.

The Supreme Court has likewise noted that "claim" has "the broadest available definition . . . ." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (quoting *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991)); *see also In re Remington Rand*, 836 F.2d at 826, 829 ("Congress defined

10

'claim' in the broadest possible terms . . ." and "unambiguously stated its intent to address all possible legal obligations in defining a bankruptcy claim . . . .") (citations omitted). The Supreme Court has stated that,

> [i]n determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits . . . . [B]ankruptcy courts must administer and enforce the Bankruptcy Act as interpreted by this Court in accordance with authority granted by Congress to determine how and what claims shall be allowed under equitable principles.

*Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 162-63 (1946).

The *Frenville* court focused on the "right to payment" language in § 101(5) and, according to some courts, "impos[ed] too narrow an interpretation on the term claim," *Piper*, 58 F.3d at 1576 n.2, by failing to give sufficient weight to the words modifying it: "contingent," "unmatured," and "unliquidated." The accrual test in *Frenville* does not account for the fact that a "claim" can exist under the Code before a right to payment exists under state law.

We are persuaded that the widespread criticism of *Frenville*'s accrual test is justified, as it imposes too narrow an interpretation of a "claim" under the Bankruptcy Code. Accordingly, the *Frenville* accrual test should be and now is overruled.

## B.     When a Claim Arises

Our decision to overrule *Frenville* leaves a void in our jurisprudence as to when a claim arises. That decision has various implications. One such implication involves the application of the automatic stay provided in § 362 of the Bankruptcy Code which operates to stay the commencement or continuation of any "action or proceeding" that was or could have been commenced against the debtor. *See* 11 U.S.C. §

11

362(a)(1).  The Fourth Circuit has stated, "'[t]he automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws.  It gives the debtor a breathing spell from his creditors.'"  *Grady*, 839 F.2d at 200 (quoting H.R. Rep. No. 95-595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296-97; S. Rep. No. 95-989, at 54-55 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5840).  It is applicable, however, only to stay a claim that arose pre-petition.  *See* 11 U.S.C. § 362(a)(1).

Principal among the effects of the determination when a claim arises is the effect on the dischargeability of a claim.  Under 11 U.S.C. § 1141(d)(1)(A) of the Code, the confirmation of a plan of reorganization "discharges the debtor from any debt that arose before the date of such confirmation . . . ."  A "debt" is defined as liability on a "claim," *id.* § 101(12), which in turn is defined as a "right to payment," *id.* § 101(5).  This is consistent with Congress' intent to provide debtors with a fresh start, an objective, noted the Second Circuit, "made more feasible by maximizing the scope of a discharge."  *United States v. LTV Corp. (In re Chateaugay)*, 944 F.2d 997, 1002 (2d Cir. 1991).  On the other hand, a broad discharge may disadvantage potential claimants, such as tort claimants, whose injuries were allegedly caused by the debtor but which have not yet manifested and who therefore had no reason to file claims in the bankruptcy.  These competing considerations have not been resolved consistently by the cases decided to date.

Moreover, the determination when a claim arises has significant due process implications.  If potential future tort claimants have not filed claims because they are unaware of their injuries, they might challenge the effectiveness of any purported notice of the claims bar date.  Discharge of such claims without providing adequate notice raises questions under the Fourteenth Amendment.  *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The courts have generally divided into two groups on the decision as to when a claim arises for purposes of the Code, with numerous variations.  One group has applied the conduct test and the other has applied what has been termed the pre-petition

12

relationship test. Illustrative of the cases that have adopted the conduct test is the decision of the Fourth Circuit in *Grady*, 839 F.2d at 201.

In *Grady*, the plaintiff had inserted a Dalkon Shield intrauterine contraceptive device several years before the manufacturer filed a petition for Chapter 11 bankruptcy. *Id.* at 199. The plaintiff alleged that she experienced injuries from the Dalkon Shield, including the need for a hysterectomy. *Id.* The district court, which did not refer the case to the bankruptcy court, determined that the plaintiff's claim arose "when the acts giving rise to [the defendant's] liability were performed, not when the harm caused by those acts was manifested." *Id.* (citation omitted). The court of appeals affirmed, finding that the plaintiff held a contingent claim that arose before the commencement of the bankruptcy case. *Id.* at 202-03. The court cautioned that it was not deciding whether Grady's claim "or those of [future tort claimants] are dischargeable in this case." *Id.* at 203. It held only that because the Dalkon Shield was inserted in the claimant before the filing of the bankruptcy petition, it constituted a claim within the meaning of the automatic stay, 11 U.S.C. § 362(a)(1), i.e., a pre-petition claim.[8] *Id.*

In contrast, the Eleventh Circuit criticized a conduct test that would enable individuals to hold a claim against a debtor by virtue of their potential future exposure to "the debtor's product," regardless of whether the claimant had any relationship or contact with the debtor. *In re Piper*, 58 F.3d at 1577. It stated that approach would define a "claim" too broadly in certain circumstances and would "stretch the scope of § 101(5)" too far. *Id.* Similarly, a commentator observed that under the conduct test, "[c]laimants who did not use or have any exposure to the dangerous product until long after the bankruptcy case has

_____

[8]Although the Tenth Circuit "adopt[ed] the conduct theory" in *In re Parker*, 313 F.3d at 1269, it described the courts as "divided as to a basic conduct theory versus a 'narrow conduct theory' (also called the '*Piper* test')," *id.* at 1270 n.1.

13

concluded would nonetheless be subject to the terms of a preexisting confirmed Chapter 11 plan." Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045, 2071 (2000). "These claimants may be unidentifiable because of their lack of contact with the debtor or the product and, accordingly, may not have had the benefit of notice and an opportunity to participate in the bankruptcy case." *Id.*

Some of the courts concerned that the conduct test may be too broad have adopted what has been referred to as a pre-petition relationship test. *See In re Piper*, 58 F.3d at 1576. Under this test, a claim arises from a debtor's pre-petition tortious conduct where there is also some pre-petition relationship between the debtor and the claimant, such as a purchase, use, operation of, or exposure to the debtor's product. *Id.*; *see also Lemelle v. Univ. Mfg. Corp.*, 18 F.3d 1268, 1277 (5th Cir. 1994); *cf. In re Chateaugay*, 944 F.2d at 1004-05.[9] One commentator opined that "[t]he 'pre-petition relationship test' ameliorates the problem often attributed to the 'conduct test' – that a bankruptcy proceeding cannot identify and afford due process to claimants." Barbara J. Houser, *Chapter 11 as a Mass*

---

[9] The Ninth Circuit adopted a similar test that some courts and commentators have called a "fair contemplation" test. *See Zilog, Inc. v. Corning (In re ZILOG, INC.)*, 450 F.3d 996, 999-1000 (9th Cir. 2006) (quoting *Cal. Dep't of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925, 930 (9th Cir. 1993) (per curiam)); Laura B. Bartell, *Straddle Obligations Under Prepetition Contracts: Prepetition Claims, Postpetition Claims or Administrative Expenses?*, 25 Emory Bankr. Dev. J. 39, 46 (2008) (acknowledging that the Ninth Circuit employs a "test [that] looks to when the claimant had a 'fair contemplation' that a claim exists."). In *Jensen*, the court held that a claim of environmental liability arises under the Bankruptcy Code once it is within the claimant's "fair contemplation." 995 F.2d at 930. The court in *Zilog* extended the "fair contemplation" test to an employment discrimination claim, noting that the test "has been applied to a range of non-environmental claims." *See* 450 F.3d at 1000.

14

*Tort Solution*, 31 Loy. L.A. L. Rev. 451, 465 (1998).

In *Lemelle*, the plaintiff brought a wrongful death action against the successor corporation of a mobile home manufacturer that had emerged from Chapter 11 proceedings. 18 F.3d at 1270-71. The plaintiff alleged that the decedent's death was caused by the manufacturer's defective mobile home design and construction. *Id.* The decedent died in a fire allegedly caused by the manufacturing defect about two years after the debtor's plan of reorganization was confirmed and approximately fifteen years after the design and manufacture of the mobile home. *Id.* at 1271. The district court determined that the plan of reorganization discharged all of the debtor's obligations, including the liability on the tort claim. *Id.* at 1274.

The Fifth Circuit reversed, noting that in order for the plaintiff's wrongful death claim to have been discharged in the debtor's bankruptcy, "at a minimum, there must be evidence that would permit the debtor to identify, during the course of the bankruptcy proceedings, potential victims and thereby permit notice to these potential victims of the pendency of the proceedings." *Id.* at 1277 (citation omitted). The court found that the record was "devoid of any evidence of any pre-petition contact, privity, or other relationship between [the debtor], on the one hand, and [the plaintiff] or the decedents, on the other." *Id.* The court concluded that absent any such evidence, the district court could not find "that the claims asserted by [the plaintiff] were discharged in [the debtor's] bankruptcy proceedings." *Id.* The court reasoned that "even the broad definition of 'claim' cannot be extended to include . . . claimants whom the record indicates were completely unknown and unidentified at the time [the debtor] filed its petition and whose rights depended entirely on the fortuity of future occurrences." *Id.*

The Second Circuit followed a similar approach in an environmental regulatory context. In *In re Chateaugay*, 944 F.2d at 1004-05, the court held that the EPA's post-confirmation costs of responding to a release of hazardous waste, even if not yet incurred at the time of bankruptcy, involved "claims" under §

15

101(5). The court reasoned that "[t]he relationship between environmental regulating agencies and those subject to regulation provides sufficient 'contemplation' of contingencies to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of 'claims' [under the Bankruptcy Code]." *Id.* at 1005.

A somewhat modified approach was taken by the Eleventh Circuit in a case involving the bankruptcy of Piper Aircraft, Inc., a manufacturer of general aviation aircraft and spare aircraft parts. *In re Piper*, 58 F.3d 1573. The bankruptcy court, affirmed by the district court, held that a class of future claimants who might assert, after confirmation of the debtor's plan of reorganization, personal injury or property damage claims against Piper based on its aircraft products that were manufactured or sold before the confirmation date, did not have claims under § 101(5). *See id.* at 1575-76. The bankruptcy and district courts had adopted the pre-petition relationship test which, according to the court of appeals, requires "some prepetition relationship, such as contact, exposure, impact, or privity, between the debtor's pre-petition conduct and the claimant in order for the claimant to have a § 101(5) claim." *Id.* at 1576 (internal quotation and citation omitted).

The court of appeals agreed that the pre-petition relationship test was generally superior to either our test in *Frenville*, *id.* at 1576 n.2, or the "conduct test" adopted by other courts of appeals, *id.* at 1576-77. It also held that claimants having contact with the debtor's product post-petition, but prior to confirmation, also could be identified during the course of the bankruptcy procedure. *Id.* It thus framed what it chose to denominate as the "*Piper*" test as follows:

> [A]n individual has a § 101(5) claim against a debtor manufacturer if (i) events occurring before confirmation create a relationship, such as contact, exposure, impact, or privity, between the claimant and the debtor's product; and (ii) the basis for liability is the debtor's prepetition conduct in designing, manufacturing and selling the allegedly defective or dangerous product.

*Id.* at 1577. The court stated that "[t]he debtor's prepetition conduct gives rise to a claim to be administered in a case only if there is a relationship established before confirmation between an identifiable claimant or group of claimants and that prepetition conduct." *Id.*

The court of appeals observed that "the courts applying the conduct test also presume some prepetition relationship between the debtor's conduct and the claimant." *Id.*; *cf. In re Parker*, 313 F.3d at 1270 n.1 (noting that "the relationship in the case before us would meet either [the conduct] test [or the prepetition relationship test]"). The pre-petition relationship test operates much like the conduct test, but it requires a pre-petition relationship between the debtor and the putative claimant. *See In re Pan Am. Hosp.*, 364 B.R. at 845 (discussing same).

The pre-petition relationship test in *Piper* has been criticized for narrowing the definition of "claim" under 11 U.S.C. § 101(5). *See e.g.,* Michelle M. Morgan, *The Denial of Future Tort Claims in* In re Piper Aircraft: *Will the Court's Quick-Fix Solution Keep the Debtor Flying High or Bring it Crashing Down?*, 27 Loy. U. Chi. L.J. 27, 31-35 (1995). In a final report issued in 1997, the National Bankruptcy Review Commission proposed a definition of "claim" that incorporated the conduct test, albeit with some limitations, rather than the pre-petition relationship test.[10] *See* Nat'l Bankr. Rev. Comm'n, *Bankruptcy: The Next Twenty Years*, National Bankruptcy Review Commission Final Report at 326 (Oct. 20, 1997), *reprinted in* Volume G *Collier on Bankruptcy* App. Pt. 44-332 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2009).

In addition, various bankruptcy courts have followed a

---

[10] Congress created the National Bankruptcy Review Commission in 1994 to investigate problems in the bankruptcy system and to suggest legislative and administrative solutions. *See Woskob v. Woskob (In re Woskob)*, 305 F.3d 177, 186 n.3 (3d Cir. 2002) (citing Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106 §§ 602-03 (1994)).

form of the conduct test when considering the existence of an asbestos-related claim. *See, e.g.*, *In re Quigley Co.*, 383 B.R. 19, 27 (Bankr. S.D.N.Y. 2008) ("If the Asbestos PI Claimant was exposed to asbestos before the Quigley petition date, he or she holds a 'claim.'"); *In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 424 (Bankr. D. Md. 2007) ("A claim [for asbestos-related injury by a 'non-manifesting' asbestos victim] arises upon exposure, not manifestation." (citing *Grady*, 839 F.2d at 198)).

Irrespective of the title used, there seems to be something approaching a consensus among the courts that a prerequisite for recognizing a "claim" is that the claimant's exposure to a product giving rise to the "claim" occurred pre-petition, even though the injury manifested after the reorganization. We agree and hold that a "claim" arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a "right to payment" under the Bankruptcy Code. *See* 11 U.S.C. § 101(5). Applied to the Van Brunts, it means that their claims arose sometime in 1977, the date Mary Van Brunt alleged that Grossman's product exposed her to asbestos.

That does not necessarily mean that the Van Brunts' claims were discharged by the Plan of Reorganization. Any application of the test to be applied cannot be divorced from fundamental principles of due process.[11] Notice is "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality . . . ." *Mullane*, 339 U.S. at 314. Without notice of a bankruptcy claim, the claimant will not have a meaningful opportunity to protect his or her

---

[11] Because we have before us an asbestos case, we do not decide when a "claim" arises in the context of an environmental cleanup case involving conflicting statutory frameworks. *See In re Jensen*, 995 F.2d at 930; *In re Chateaugay*, 944 F.2d at 1004-05; *see also Matter of Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 974 F.2d 775, 781 (7th Cir. 1992) ("[T]he determination of when a party has a claim . . . seems to hinge on the nature of the claim and the posture of the case.")

18

claim. *See* 11 U.S.C. § 342(a) ("There shall be given such notice as is appropriate . . . of an order for relief . . . under [the Bankruptcy Code]."). Inadequate notice therefore "precludes discharge of a claim in bankruptcy." *Chemetron*, 72 F.3d at 346. This issue has arisen starkly in the situation presented by persons with asbestos injuries that are not manifested until years or even decades after exposure.

The most innovative approach yet to the asbestos problem was adopted by the New York bankruptcy court as part of the Manville plan of reorganization. *See In the Matter of Johns-Manville Corp.,* 68 B.R. 618 (Bankr. S.D.N.Y. 1986). In an effort "to grapple with a social, economic and legal crisis of national importance within the statutory framework of [C]hapter 11," the bankruptcy court oversaw the "largely consensual plan" leading to the establishment of a trust out of which all asbestos health-related claims were to be paid. *Id.* at 621. The trust was "designed to satisfy the claims of all victims, whenever their disease manifest[ed]," (the "Manville Trust"). *Id.* at 628. Manville agreed to fund the trust in an amount that, over time, was "in excess of approximately $2.5 billion." *Id.* at 621. The Manville Trust was the basis for Congress' effort to deal with the problem of asbestos claims on a national basis, which it did by enacting § 524(g) of the Bankruptcy Code as part of the Bankruptcy Reform Act of 1994. *See* H.R. Rep. No. 103-835, at 40 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3348-49. Section 524(g) authorizes courts "to enjoin entities from taking legal action for the purpose of . . . collecting, recovering, or receiving payment or recovery with respect to any [asbestos-related] claim or demand" through the establishment of a trust from which asbestos-related claims and demands are paid. 11 U.S.C. § 524(g)(1)(B). This court summarized the statutory prerequisites imposed by § 524(g) in *In re Combustion Engineering, Inc.,* 391 F.3d 190, 234 n.45 (3d Cir. 2005).[12]

_____

[12] "To qualify for [the] protections [of § 524(g)], a court must find that the debtor has been named in an action for damages allegedly caused by asbestos, that the debtor is likely to be subject to substantial demands for payment in the future arising out of the

It is apparent from the legislative history of § 524(g) that Congress was concerned that future claims by presently unknown claimants could cripple the debtor's reorganization. Senator Graham stated during floor debate on the bill that § 524(g) "provides companies who are seeking to fairly address the burden of thousands of current asbestos injury claims *and unknown future claims* . . . a method to pay their current asbestos claims and provide for equitable treatment of future asbestos claims." 140 Cong. Rec. S4523 (Apr. 20, 1994) (emphasis added). The House of Representatives Committee on the Judiciary wrote in its report that § 524(g) was included in the bill "to offer similar certitude to other asbestos trust/injunction mechanisms that meet the same kind of high standards with respect to regard for the rights of claimants, present and future, as displayed in [*Johns-Manville* and a case following it, *In re UNR INDUS., INC.*, 71 B.R. 467, 473 (Bankr. N.D. Ill. 1987)]." H.R. Rep. No. 103-835, at 41 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3349.

By enacting § 524(g), Congress took account of the due process implications of discharging future claims of individuals

---

same or similar conduct, that the amounts and timing of such future claims are uncertain, and that permitting the pursuit of such claims outside the trust mechanism would threaten the plan's attempts to deal equitably with current and future demands. 11 U.S.C. §§ 524(g)(2)(B)(i)(I), (ii)(I-III). The trust itself must also satisfy certain standards under § 524(g) in order to qualify for the issuance of a channeling injunction directing all future claims to the trust: the trust must assume the liabilities of the debtor for current and future claims and must be funded at least in part by the securities of the debtor; the trust must either own, or be entitled to own, the majority of the voting shares of the debtor, its parent, or its subsidiary; the trust must use its assets to pay future claims and demands; and the trust must provide for mechanisms ensuring its ability to value and pay present and future claimants in substantially the same manner. 11 U.S.C. §§ 524(g)(2)(B)(i)(I)-(IV), (ii)(V)." *In re Combustion Eng'g*, 391 F.3d at 234 n.45.

whose injuries were not manifest at the time of the bankruptcy petition. We observed in *Combustion Engineering* that

> [m]any of the[ ] requirements [in § 524(g)] are specifically tailored to protect the due process rights of future claimants. For example, a court employing a § 524(g) channeling injunction must determine that the injunction is "fair and equitable" to future claimants, 11 U.S.C. § 524(g)(4)(B)(ii), and must appoint a futures representative to represent their interests. 11 U.S.C. § 524(g)(4)(B)(I). The court must also determine that the plan treats "present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(2)(B)(ii)(V). Finally, the statute requires that a 75% super-majority of claimants whose claims are to be addressed by the trust vote in favor of the plan. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

*In re Combustion Eng'g*, 391 F.3d at 234 n.45.

The due process safeguards in § 524(g) are of no help to the Van Brunts as Grossman's Plan of Reorganization did not provide for a channeling injunction or trust under that provision.[13] A court therefore must decide whether discharge of the Van Brunts' claims would comport with due process, which may invite inquiry into the adequacy of the notice of the claims bar date. The only open matter before the District Court is JELD-WEN's request for a declaration that the Van Brunts' claims had been discharged.

Whether a particular claim has been discharged by a plan of reorganization depends on factors applicable to the particular case and is best determined by the appropriate bankruptcy court or the district court. In determining whether an asbestos claim

---

[13] Nor could it have done so, as § 524(g) applies only to companies that have been sued for damages before the date of the bankruptcy petition. *See* 11 U.S.C. § 524 (g)(2)(B)(i)(I).

has been discharged, the court may wish to consider, inter alia, the circumstances of the initial exposure to asbestos, whether and/or when the claimants were aware of their vulnerability to asbestos, whether the notice of the claims bar date came to their attention, whether the claimants were known or unknown creditors, whether the claimants had a colorable claim at the time of the bar date, and other circumstances specific to the parties, including whether it was reasonable or possible for the debtor to establish a trust for future claimants as provided by § 524(g).

These are not factors for consideration in the first instance by this court sitting en banc. Both the Bankruptcy Court and the District Court held that the Van Brunts' state law claims survived under *Frenville*. Neither had any reason to consider whether the Van Brunts' claims were discharged.

**IV.**

**Conclusion**

Accordingly, we will reverse the decision of the District Court and remand this case to the District Court for further proceedings consistent with this opinion.